UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


KENDRICK M. JACKSON,

     Petitioner,

v.                                                                    Case No. 4:19cv368-WS-HTC

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,

     Respondent.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Petitioner Kendrick M. Jackson's amended petition under 28 U.S.C. § 2254 raising two (2) claims of ineffective assistance of trial counsel and challenging his conviction in the circuit court of Duval County, Florida, 2012 CF 5207.  ECF Doc. 6.  The matter was referred to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B).  After considering the amended petition, the State's response (ECF Doc. 21), and Petitioner's reply (ECF Doc. 29), the undersigned recommends the amended petition be DENIED without an evidentiary hearing.

## I.  BACKGROUND

### A.    Offense and Conviction

The charges against Petitioner flowed from a home-invasion robbery involving two perpetrators.  The following is a summary of the evidence introduced at trial, September 3-6, 2013.  *See* Tr. Trans., beginning in ECF Doc. 23-31 at 63.

During the early morning hours of May 25, 2012, the victim, Doran Moore, was asleep in his second-floor apartment when he heard his door being kicked.  ECF Doc. 23-34 at 34-35.  Moore awoke to see a man, 6'2" or 6'3" and around 260 pounds in the room, wearing a ski mask and brandishing a handgun.  *Id.* at 36-37.  The intruder ordered Moore into the living room, where he encountered a second man, also wearing a ski mask, standing around 6'0" to 6'1" tall, weighing between 175 and 185 pounds, and holding a "big assault rifle".  *Id.* at 38.

The stockier man began hitting Moore in the head with the handgun, so Moore attempted to grab the rifle from the thinner man, resulting in a scuffle.  *Id.* Subsequently, Moore heard a gunshot and fled.  *Id.* at 39-40.  He ran out the door, down the stairs, and around a corner.  *Id.* at 40.  Moore heard the two intruders go down the stairs and take "a couple of shots" at him, then he heard "a car bail out." *Id.* at 41.  Moore waited for a bit, then went back up to his apartment.  *Id.* at 42.  As he was cleaning his injuries, the police came, even though Moore had not called them.  *Id.* at 42-43.

Instead, one of the people who called 911 was one of Moore's neighbors. The neighbor testified he heard "something bang against like the glass sliding door", checked the front of his apartment, but did not see anything. ECF Doc. 23-35 at 43. A few minutes later he heard gunshots and called 911. *Id.*

Another person who dialed 911 was the apartment complex's security guard (retired police officer Victor Hughes), who was on patrol in his vehicle at the apartment complex that night. After 20 to 30 minutes on patrol, without seeing anyone in the complex, he heard gunshots around 3:30 a.m. *Id.* at 50. As he turned to drive towards the source of the sound, he was met by a car coming out of the complex at around 30 miles per hour with its headlights off. *Id.* at 55. The car stopped, and Hughes shined his LED flashlight at the two occupants through the windshield. *Id.* at 56. He was able to see their faces as they were not wearing ski masks. *Id.* at 57. Hughes described the driver as "stocky" and the passenger as "slim-built." *Id.*

After a moment, the car pulled around Hughes' vehicle and proceeded further into the apartment complex. *Id.* at 58. Hughes then called 911. *Id.* The 911 call was played to the jury, during which Hughes identified the car as a "red Chevy, probably a Cruze." ECF Doc. 23-34 at 5. As Hughes spoke with the 911 dispatcher, Hughes drove out of the complex and around to the other exit of the complex and blocked it with his vehicle. ECF Doc. 23-34 at 1. When Hughes exited his vehicle,

the man he recognized as the passenger in the red car came running and "almost ran right into" Hughes.  Hughes (who has a concealed-carry permit) detained him at gunpoint until police arrived.  *Id.*  At trial, Hughes identified co-defendant, Terrence Paris, II, as the slim-built passenger he detained.  *Id.* at 7.

Once police arrived, Hughes gave them a description of the driver of the red car, and officers began looking for him in the area around the complex.  *Id.* at 55. Officer Rossomano testified that when he arrived to the scene, he was given a description of a "heavy-set black male wearing all dark clothing" who "moved to the west".  Officer Rossomano returned to his vehicle and began searching for the suspect.  ECF Doc. 25-36 at 33.  At 3:40 a.m., Officer Rossomano encountered Petitioner walking down the street less than a mile from the crime scene.  *Id.* at 45. Officer Rossomano testified that Petitioner matched the description he had been given and was the only person he saw in the area at that time of night.  *Id.* at 36. Officer Rossomano also testified that although Petitioner was not "really out of breath" he was "nervous and [his] clothes were damp with sweat."  *Id.* at 38.  Officer Rossomano identified Petitioner in open court as the individual he stopped that night. *Id.* at 39.  After Petitioner was detained, another officer brought Hughes to the scene of the stop for a "show-up" identification.    Hughes identified Petitioner "instantaneously" as the driver of the red car.  *Id.* at 61.

Back at the apartment complex, officers discovered an abandoned red Chevy Impala left in the middle of the driving area of the parking lot, about 300 yards from the entrance way. *Id.* at 9. Inside the car, officers found a debit card bearing the name of Terrence Paris, II, ECF Doc. 23-21 at 5-7; ECF Doc. 23-38 at 60, and a rifle consistent with the description of the weapon held by the thinner attacker. ECF Doc. 23-34 at 37-38. Law enforcement also found Petitioner's palm prints on the outside of the driver's door and window. ECF Doc. 23-42 at 26. Next to the car, officers found a brown ski mask, which was tested for DNA. ECF Doc. 23-37 at 17-19. Petitioner was found to be a major contributor of the DNA on the mask, with the DNA expert testifying that the odds of the DNA in the mask randomly matching Petitioner's DNA were one in one sextillion. ECF Doc. 23-40 at 35-36.

After Officer Rossomano apprehended Petitioner, he returned to the apartment complex with K-9, Caine, who is trained to track the "freshest human odor". ECF Doc. 25-36 at 48. The dog tracked from the red car toward the west, *id.* at 52, and alerted under a nearby car, having detected a handgun matching the description Moore gave of the gun used by the stockier perpetrator. *Id.* at 40-41. A DNA expert testified that blood on the handgun matched Moore's. ECF Doc. 23-40 at 29. Officer Rossomano and Caine continued tracking the scent westward, "through the bushes, over some fences" towards "the location … of where Mr.

Jackson was located" before Officer Rossomano called off the tracking.  ECF Doc. 25-36 at 52.

The officers also processed the apartment area, finding evidence of a struggle, bullet holes, a broken door jamb consistent with the door being kicked in, ECF Doc. 23-6 at 2; ECF Doc. 23-34 at 52-53, and three shell casings (two .223 caliber casings and one 9 millimeter casing) outside the apartment, ECF Doc. 23-39 at 24.   A ballistics expert testified he was able to "conclusively determine" that one of the .223 caliber casings was fired by the rifle found in the red Chevy Impala, ECF Doc. 23-41 at 39, and that the 9 millimeter casing was fired by the handgun found under the vehicle near the red Chevy Impala.  *Id.* at 31.

Officers also found 1.2 pounds of marijuana, with some of it in seven individual packages of marijuana, and scales in Moore's apartment.  ECF Doc. 23-37 at 53.  Although Moore originally told law enforcement the drugs were not his, he testified at trial that they were his.  ECF Doc. 23-34 at 56-57.

Eventually, officers determined the red Chevy Impala had been rented by Kameron Wesley, Petitioner's girlfriend, ECF Doc. 23-38 at 30.  Also, video showed that Petitioner was present when the car was rented.  ECF Doc. 23-38 at 38-42.  A Hertz representative testified at trial and confirmed the vehicle had been rented on May, 24, 2012, the day before the incident.  *Id.* at 33.

Petitioner and Paris were tried jointly, and each adopted a strategy of misidentification.  As defense counsel described it in the evidentiary hearing on Petitioner's 3.850 motion, "the best argument was that although Mr. Jackson could be connected to the vehicle the vehicle was not necessarily connected to the offense, nor the individuals within the vehicle."  ECF Doc. 23-50 at 68.  The strategy was unsuccessful, and on September 6, 2013, Petitioner was convicted by a jury of (1) armed burglary of a dwelling with an assault or battery and with a firearm that was discharged and (2) possession of a firearm by a convicted felon.  ECF Doc. 23-25 at 254.  Petitioner was sentenced to life in prison on October 10, 2013.  Judgment, ECF Doc. 23-46 at 26.

### B.    Post-Conviction History and Timeliness

Petitioner filed a timely appeal of the judgment and sentence to the First District Court of Appeal ("First DCA"), which affirmed *per curiam* and without written opinion on July 29, 2014.  ECF Doc. 23-45 at 125; Case No.: 1D13-5484.  Petitioner did not seek review in the Florida Supreme Court or file a petition for certiorari to the U.S. Supreme Court, ECF Doc. 6 at 3-4.  Therefore, the judgment and conviction became final on Monday, October 27, 2014.  *Jackson v. Sec'y of Dept. of Corr.*, 292 F.3d 1347, 1349 (11th Cir. 2002) (judgment becomes final after expiration of 90 days for filing certiorari review).

Eighty-six (86) days later, on January 21, 2015, Petitioner filed a Florida Rule of Criminal Procedure 3.850 Motion for Post-Conviction Relief.  ECF Doc. 23-45. On October 31, 2017, the trial court denied the motion, ECF doc. 23-46 at 147, and on April 11, 2019, the First DCA issued a *per curiam* affirmance without written opinion, ECF Doc. 23-51 at 117; Case No.: 1D17-5194, and issued the mandate on June 24, 2019.  ECF Doc. 23-51 at 126.  Forty-two (42) days later Jackson filed the instant federal petition on August 5, 2019.  Because only 128 days elapsed on the 1-year statute of limitations, as the Respondent acknowledges, the petition is timely filed.[1]

## II.    LEGAL STANDARD

The AEDPA governs a state prisoner's petition for habeas corpus relief.  28 U.S.C. § 2254.  Under that AEDPA, relief may only be granted on a claim adjudicated on the merits in state court if the adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[1] Generally, under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a petitioner has one year from when the judgment becomes final to file an application for habeas relief.  28 U.S.C. § 2244(d)(1).  Such time is tolled by the filing and pendency of post-conviction motions, such as a Rule 3.850 motion.  28 U.S.C. § 2244(d)(2).

28 U.S.C. § 2254(d). This standard is both mandatory and difficult to meet. *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014).

"Clearly established federal law" consists of the governing legal principles set forth in the decisions of the United States Supreme Court when the state court issued its decision. *Id.*; *Casey v. Musladin*, 549 U.S. 70, 74 (2006) (citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). A decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts. *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010); *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of Supreme Court precedent if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005); *Bottoson v. Moore*, 234 F.3d 526, 531 (11th Cir. 2000), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Bottoson*, 234 F.3d at 531 (quoting *Williams*, 529 U.S. at 406). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision."

*Harrington v. Richter*, 562 U.S. 86, 101 (2011). "[T]his standard is difficult to meet because it was meant to be." *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018).

Finally, when reviewing a claim under 28 U.S.C. § 2254(d), a federal court must remember that any "determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.").

## IV.  ANALYSIS

Petitioner raises two (2) grounds for relief, both of which are premised on alleged ineffective assistance of trial counsel ("IATC"), and both of which were raised in Petitioner's 3.850 motion. Thus, as an initial matter, Petitioner has exhausted these claims.

To succeed on an IATC claim, Petitioner must show (1) counsel's performance during representation fell below an objective standard of reasonableness, and (2) prejudice resulted, *i.e.*, that a reasonable probability exists that but for counsel's unprofessional conduct, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 689 (1984). The reasonableness of counsel's performance is to be evaluated from counsel's

perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential. *Id.* at 689. The Petitioner bears the burden of proving that counsel's performance was unreasonable under prevailing professional norms and that the challenged action was not sound strategy. *Id.* at 688-89.

*Strickland*'s prejudice prong requires a petitioner to allege more than simply that counsel's conduct might have had "some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. A petitioner must show a reasonable probability exists that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Bare allegations the petitioner was prejudiced by counsel's performance are not enough. *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987).

For the reasons discussed below, the undersigned agrees with the state court's determination that Petitioner has failed to meet the *Strickland* standard as to either of his claims.

**A.    Ground One:  Trial Counsel Was Ineffective for Failing to Move for a Severance from Co-Defendant and Present Petitioner's Defense of Self-Defense.**

In Ground One, Petitioner claims counsel was ineffective for failing to move to sever his case from that of co-defendant, Paris, and to present a theory of self-defense. Petitioner provides the details of this claim in the amended 3.850 motion.

In that motion, Petitioner contends he and Parris went to Moore's residence "to discuss arrangements for potentially delivering Moore's marijuana (valued at $10,000) to a third party for a fee." ECF Doc. 23-45 at 196. He claims Moore let the men into the residence so there was no burglary. *Id.* Petitioner contends, while there, Parris and Moore got into an argument and then the two struggled over the rifle. *Id.* Thus, "in an effort to break up the fight," Petitioner hit Moore in the head with a nearby handgun, and when that did not work, Petitioner fired two shots into the apartment wall. *Id.* Petitioner further claims after Moore ran out of the apartment, Paris ran after him with the rifle and fired two shots. *Id.* Petitioner admits to running out of the apartment with the handgun, getting into a vehicle, then fleeing on foot and throwing the handgun away. *Id.*

Based on this version of events, Petitioner alleges he wanted to pursue a theory of self-defense and, because that theory conflicted with his co-defendant's theory of misidentification, Petitioner claims counsel was ineffective for not moving to sever the two cases. ECF Doc. 6 at 11-13.

The state circuit court[2] applied *Strickland* and denied relief on this ground because a motion to sever would only be necessary if Petitioner had proceeded on a

---

[2] Because the First DCA affirmed the circuit court's denial of the 3.850 motion without written opinion, this Court will "look through" the unexplained decision of the First DCA to the circuit court's explanation -- the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

theory of self-defense.  But, the evidence, including Petitioner's testimony, did not support either (1) the discussion of that theory with counsel or (2) the viability of such a theory.  ECF Doc. 23-46 at 149-50.  For the reasons discussed below, the undersigned finds this conclusion was not contrary to, and did not involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.  28 U.S.C. § 2254(d).

First, as the state court determined, the testimony at the evidentiary hearing on the 3.850 motion belies this claim.  Petitioner was asked "when preparing for trial did you and your attorney, Ms. Wright, discuss trial defenses?"  He replied, "Not really."  ECF Doc. 23-50 at 45.  Although Petitioner claimed he told counsel he wanted to follow a theory of "drug deal gone wrong", he admitted he never told counsel he was willing to admit to specific crimes in relation to the drug-deal-gone-wrong defense.  *Id.* at 45-46.  Moreover, trial counsel testified at the 3.850 evidentiary hearing that Petitioner never brought up a self-defense theory to her. ECF Doc. 23-50 at 67.

The state court observed the demeanor of Petitioner and counsel, found Petitioner's "claim and testimony to be incredible" and counsel's "testimony to be credible", and made the specific factual determination that "counsel was not ineffective for failing to pursue a theory of self-defense because Defendant never told her that was the strategy he wanted."  ECF Doc. 23-46 at 150.  The Petitioner

has not rebutted the presumption of correctness due that factual determination by any evidence, much less "clear and convincing" evidence. *See* 28 U.S.C. § 2254(e)(1) ("determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."); *Bishop v. Warden*, GDCP, 726 F.3d 1243, 1259 (11th Cir. 2013) ("In the absence of clear and convincing evidence, we have no power on federal habeas review to revisit the state court's credibility determinations.").

Second, the record contradicts Petitioner's claim. At trial, after the State rested, the judge gave Petitioner a chance to speak with counsel and then specifically asked Petitioner if he wanted to testify or present evidence. ECF Doc. 23-42 at 35-39. Defendant stated he agreed with the strategy of not presenting evidence in his defense. *Id.* at 36-37. The judge gave him another chance to consult with counsel, but Petitioner declined. *Id.* at 37. Thus, Petitioner had the opportunity to complain that his self-defense theory was not being presented but chose not to.

Third, the evidence presented at trial, as discussed above, was inconsistent with a self-defense theory. The State submitted photographs of the broken door jamb, which is consistent with Moore's testimony that the door was kicked in and inconsistent with Petitioner's proposed theory that Moore invited the two men into the apartment. A theory of self-defense is also inconsistent with the ski masks found

outside containing Petitioner's DNA, which Moore testified the two men were wearing (and would have had no other reason to wear in May in Florida).

Petitioner's theory was therefore implausible and unlikely to succeed. An attorney's performance cannot be deemed deficient for failing to raise claims that are "reasonably considered to be without merit." *United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000) (quotation omitted). *See Knowles v. Mirzayance*, 556 U.S. 111, 126-27 (2009) (the law does not require counsel to raise every available non-frivolous defense). Likewise, Petitioner is unable to show a reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. Therefore, he cannot show any prejudice from not seeking a severance and presenting this theory of defense.

### B.    Ground Two: Trial Counsel Was Ineffective for Failing to Request a Lesser Included Offense Jury Instruction

Petitioner argues counsel was ineffective for failing to request a lesser included offense jury instruction for simple battery be added to the instruction for burglary with a battery or assault. ECF Doc. 6 at 15. He claims he was prejudiced by this failure because "had the proper lesser included offense instruction been given to the trier of facts, they may have found that Petitioner had no intent other than to expedite the transaction intended, and that upon entering the premises the circumstances changed and the Petitioner subsequently formed the intent to commit an offense such as simple battery or assault." *Id.* at 16.

The state court denied relief on this claim because "[u]nder <u>Strickland</u>, a defendant cannot, as a matter of law, demonstrate prejudice by relying on the possibility of a jury pardon, which by definition assumes that the jury would have disregarded the law, the trial court's instructions, and the evidence presented." ECF Doc. 23-46 at 155-56. This conclusion was not contrary to, and did not involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d).

First, as noted above, the evidence in the case contradicted Petitioner's argument Moore had invited him into the apartment, and for a defendant to be entitled to a certain instruction, he must have a "valid defense supported by evidence or testimony in the case." *Coday v. State*, 946 So. 2d 988, 994 (Fla. 2006); *State v. Weller,* 590 So.2d 923, 927-28 (Fla. 1991). Therefore, Petitioner has not shown counsel's request for a lesser-included instruction would even have been granted.

Second, Petitioner's argument is foreclosed by *Strickland* itself. The jury in Petitioner's case found all elements of the main offense beyond a reasonable doubt. Thus, to convict only on the lesser offense would mean "the jury would have disregarded its oath and violated its instructions by acquitting him of the greater offense and convicting him of a lesser one even though the evidence supported both crimes." *Crasper v. Secretary*, 855 Fed. Appx. 626, 628 (11th Cir. 2021). As *Crasper* explained, this argument was addressed and foreclosed by *Strickland*. In

*Strickland*, the Supreme Court made clear that "[a] defendant has no entitlement to the luck of a lawless decisionmaker" and that the prejudice inquiry excludes the "particular idiosyncrasies" of the jury and "the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like," such as a jury pardon. *Id*. at 628 (quoting *Strickland*, 466 U.S. at 695). These limitations follow from the nature of the prejudice inquiry, which is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.*

Likewise, as the Secretary points out, "[t]he Eleventh Circuit has supported the Florida Supreme Court's reasoning [in *Sanders v. State*, 946 So. 2d 953 (Fla. 2006)], explaining that, under *Strickland*, the Court must presume the jury acted according to law" and "to assume, after finding a defendant guilty of the main accusation, the jury 'would have used its power to pardon [the defendant] necessarily assumes that the jury would have disregarded the trial court's instructions.'" *Rosato v. Sec'y, Dep't of Corr.*, 2018 WL 8895808, at *28 (M.D. Fla. Mar. 29, 2018) (citing *Torres v. Sec'y, Dep't of Corr.*, 2017 WL 5997387 at 7 (11th Cir. June 2, 2017); *Santiago v. Sec'y, Fla. Dep't of Corr.*, 472 F. App'x 888, 889 (11th Cir. 2012) (per curiam) (State court did not unreasonably apply *Strickland*, explaining: "The jury in [the defendant's] trial concluded that the evidence against him supported his conviction for the greater offenses on which it was instructed; therefore, even if the lesser-offense instructions had been given, the jury would not have been permitted

to convict [the defendant] of the lesser included offenses because it had concluded that the evidence established that he was guilty of the greater offenses.").

Indeed, courts in this District have consistently rejected similar claims. *See Montgomery v. Inch*, 2020 WL 738364 at 7 (N.D. Fla. Feb. 3, 2020), *report and recommendation adopted*, 2020 WL 733882 (N.D. Fla. Feb. 12, 2020) ("Thus, the undersigned cannot say that the state court unreasonably applied *Strickland* in concluding that defense counsel's failure to request jury instructions on the lesser-included offenses did not prejudice Montgomery's defense.") (citing *Santiago*, 472 F. App'x at 888-89); *Braddy v. Inch*, 2019 WL 8510071 at 24 (N.D. Fla. Apr. 11, 2019), *report and recommendation adopted*, 2020 WL 550260 (N.D. Fla. Feb. 4, 2020) ("Therefore, even if the lesser offense instruction on attempted voluntary manslaughter had been given, the jury would not have been permitted to convict Petitioner of any lesser included offense because the jury had concluded that the evidence established that Petitioner was guilty of the greater offense.") (citing *Sanders*, 946 So. 2d at 958). Thus, Petitioner is not entitled to habeas relief on this claim.

## IV.    CONCLUSION

### A.    Evidentiary Hearing

The undersigned finds that an evidentiary hearing is not warranted. In deciding whether to grant an evidentiary hearing, this Court must consider "whether

such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). Additionally, this Court must take into account the deferential standards prescribed by § 2254. *See id.* Upon consideration, the undersigned finds that the claims in this case can be resolved without an evidentiary hearing. *See Schriro*, 550 U.S. at 474.

### B. Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

After review of the record, the Court finds no substantial showing of the denial of a constitutional right. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, it is also recommended that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Rule 11(a), Rules Governing Section 2254 Cases. If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully RECOMMENDED:

1.    That the amended petition under 28 U.S.C. § 2254, ECF Doc. 6, be DENIED without an evidentiary hearing.

2.    That a certificate of appealability be DENIED.

3.    That the clerk be directed to close the file.

At Pensacola, Florida, this 20th day of January, 2022.

*/s/ Hope Thai Cannon*

**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations must be filed **within fourteen (14) days** of the date of the Report and Recommendation. Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control. An objecting party must serve a copy of its objections upon all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.